# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. CR 16-00857-BRO |
|---|---|
| Plaintiff, | |
| v. | **ORDER RE MOTION TO SUPPRESS AND TO QUASH ARREST** |
| SEVAN KARAPETYAN, | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court is Defendant Sevan Karapetyan's ("Defendant") Motion to Suppress and to Quash Arrest. (Dkt. No. 43 (hereinafter, "Motion" or "Mot.").) The Court has considered the papers filed in support of and in opposition to the instant Motion, as well as evidence presented and the oral argument of counsel at the hearing held in this matter on August 4, 2017. As stated at the hearing in this matter, this Order supplements the Court's oral ruling. For the following reasons, the Motion is **DENIED**.

//
//
//

## II. BACKGROUND

### A. Statement of Facts

On the morning of December 1, 2016, at approximately 5:40 a.m. and before the sun had risen, Los Angeles Police Department ("LAPD") Officers Erick Barrera and Gonsalo Nava (collectively, the "Officers") were conducting "surveillance patrol" in the area of 1247 Stoner Avenue, an apartment building in West Los Angeles (Dkt No. 1 (hereinafter, "Complaint" or "Compl.") ¶¶ 5, 6a), due to a rise in mail theft in the area (*see* Declaration of Erick Barrera (Dkt. No. 44-1) (hereinafter, "Barrera Decl.") ¶ 3.) Officer Barrera saw Defendant exit the lobby doors of the apartment building while "struggling to balance and carry" several packages, look up and down the street, walk south towards Texas Avenue, stop and turn around, look up and down the street once more, walk north on Stoner Avenue, and finally enter an alley north of the apartment complex. This caused Officer Barrera to form the opinion that Defendant "was not a resident in the area." (Barrera Decl. ¶ 3.) Officer Barrera radioed a description of Defendant to Officer Nava and asked him to conduct a pedestrian stop. (Dkt. No. 44 (hereinafter, "Opposition" or "Opp'n.") at 9.) Officer Nava entered the alley in a marked LAPD cruiser with lights flashing and pulled up beside Defendant and told him to "stop," to which Defendant complied. Officer Nava later informed Officer Barrera that Officer Nava had asked Defendant if the packages that Defendant was carrying belonged to him. Defendant replied that they did not, and that he had found them in front of the apartment building. Defendant then complied with Officer Nava's demand to set the packages on the ground. Defendant again looked left to right. Defendant's demeanor gave Officer Nava the belief that Defendant would attempt to flee. Officer Nava responded to this possibility by ordering Defendant to turn around and put his hands on top of his head, which revealed a twelve-inch "Bowie" knife, with an approximately eight-inch blade, lodged in Defendant's waistband. (*See* Barrera Decl., Ex. 2.) According to Officer Barrera's testimony, Officer Nava then drew his gun and pointed it at

Defendant.[1] Officer Barrera approached Defendant, told him not to move, recovered the knife, placed him in handcuffs, and asked if he had identification or other weapons or contraband. Defendant responded that his I.D. was in his pocket. The pat-down search produced, among other things, the middle section of a broken metal file. (*See* Barrera Decl., Ex. 3.) LAPD Officers later discovered two pieces of a file adjacent to the front entrance of the apartment building, along with pry marks on the door jamb of the front door that matched the tip of the file. The broken pieces matched the broken file recovered from Defendant. (*See* Barrera Decl., Ex. 3.) Officer Nava then arrested Defendant for burglary in violation of California Penal Code section 459. (Dkt. No. 43-1 at 11.)

**B.      Procedural Background**

On December 22, 2016, the Government filed an indictment against Defendant, charging him with one count of possession of stolen mail in violation of 18 U.S.C. section 1708. (*See* Dkt. No. 12 at 1.) On June 27, 2017, Defendant filed the instant Motion, requesting that the Court suppress the statements he made and quash his arrest. (*See* Mot. at 2.) On July 10, 2017, the Government filed its Opposition to Defendant's Motion. (*See* Opp'n.) On August 4, 2017, the Court held an evidentiary hearing on the instant Motion. (*See* Dkt. No. 46.)

---

[1] At the hearing, the government presented testimony from Officer Barrera. The Government did not present any further witnesses. The Ninth Circuit's Model Jury Instructions provide seven factors to take into account when evaluating the credibility of a witness's testimony: (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability. 9th Cir. Model Jury Instruction No. 1.11, available at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Jury_Instructions_2014_6.pdf. Applying these factors to the Court's observations of the witness's demeanor and manner, the Court finds Officer Barrera to be credible.

## III. LEGAL STANDARD

### A. Reasonable Suspicion

The Fourth Amendment protects individuals "against unreasonable searches and seizures" and requires a warrant supported by probable cause before law enforcement may search or seize an individual or his belongings. U.S. Const. amend. IV. However, law enforcement may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987) ("A *Terry* stop involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons."). The level of suspicion required to justify an investigative stop "is considerably less than proof of wrongdoing by a preponderance of the evidence," though the officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

"The concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." *Sokolow*, 490 U.S. at 7 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)) (internal quotation marks omitted). "But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

It is the Government's burden "to articulate facts sufficient to support reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 140 (2000) (Stevens, J., dissenting) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (the Government must prove by a preponderance of the evidence that the search was lawful); *cf. United States v.*

4

*Huguez-Ilbarra*, 954 F.2d 546, 551 (9th Cir. 1992) ("The government has the burden of justifying the seizure . . . .").

### B. Custodial Interrogation

Courts engage in an objective analysis to determine whether a person is in custody. *See Stansbury v. California*, 511 U.S. 318, 323 (1994) (the inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned). A person is in custody if he or she is physically deprived of freedom of action in any significant way, *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), or is led to reasonably believe that he or she is so deprived, *Oregon v. Mathiason*, 429 U.S. 492, 497 (1977), given the totality of the circumstances, *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

In determining whether an individual is in custody, courts are likely to consider: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and[,] (5) the degree of pressure applied to detain the individual." *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (citing *United States v. Beraun-Panez,* 812 F.2d 578, 580 (9th Cir. 1987)).

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Mathiason*, 429 U.S. at 495; *Miranda*, 384 U.S. at 444. Voluntary statements made in a non-custodial setting, however, "remain a proper element in law enforcement." *Miranda*, 384 U.S. at 478. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington*, 431 U.S. 181, 187 (1977); *see also*

*Berkemer*, 468 U.S. at 439–40 (during a brief *Terry* detention, officers may, without giving *Miranda* warnings, ask "a moderate number of questions to determine [a person's] identity and to try to obtain information confirming or dispelling the officer's suspicions."). "[T]he burden of showing admissibility rests . . . on the prosecution." *Brown v. Illinois*, 422 U.S. 590, 604 (1975).

For the purpose of a suppression hearing, a defendant "'has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.'" *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (quoting *Rakas v. United States*, 439 U.S. 128, 131 n.1 (1978)). "Evidence seized in violation of the Fourth Amendment, including any 'fruit of the poisonous tree,' may not be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Cervantes*, 703 F.3d 1135, 1143 (9th Cir. 2012) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487 (1963)).

### C. Probable Cause to Arrest

Under the Fourth Amendment, a warrantless arrest requires probable cause. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981); *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988) ("An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983."). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). In determining whether probable cause exists, courts will evaluate the totality of the circumstances. *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012). Similarly, under the collective knowledge doctrine, courts will consider "the collective knowledge of all the officers involved in the criminal investigation[.]" *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (internal quotation marks omitted); *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011).

"While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *Lopez*, 482 F.3d at 1072 (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir.1984)).

Circumstances short of probable cause may justify stopping a pedestrian for further investigation; however, before an officer uses physical force or a show of authority to detain and question an individual, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 16, 19; *see Adams v. Williams*, 407 U.S. 143, 145 (1972) (an officer may conduct an investigatory stop even without probable cause to arrest) (citation omitted); *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir. 1979) ("A brief investigatory stop and detention may be based on less than would constitute probable cause for an arrest.") (citation omitted). If as a result of the stop, "the officer becomes aware of circumstances which provide probable cause for arrest, [the officer] may arrest the suspect[.]" *Chimel v. California* 395 U.S. 752, 763, (1969).

## IV. DISCUSSION

### A. Whether There Was Reasonable Suspicion to Stop Defendant

An individual may be stopped and briefly detained by an officer for investigative purposes if the officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citation omitted). Here, Defendant's actions, when considered in context, establish reasonable suspicion to justify an investigatory stop. *See United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) ("Under the totality of the circumstance test, otherwise innocent

behavior may be indicative of criminality when viewed in context."); *see also Montero-Camargo*, 208 F.3d at 1130 ("conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus").

Defendant was walking outside an apartment building, and appeared to be "unfamiliar with the area," as he exited the lobby of the apartment, looked up and down the street, walked south towards Texas Avenue, backtracked north on Stoner Avenue, again looked up and down the street, and then turned left into an alley adjacent to the apartment building. Defendant's walking back and forth caused Officer Barrera to believe that he was likely "not a resident in the area[,]" and was unsure of where he wanted to go. Defendant was "struggling to balance and carry" several packages in a neighborhood with high rates of mail theft. (Barrera Decl. ¶¶ 3, 4); *see Wardlow*, 528 U.S. at 119 ("a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation") (citation omitted); *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (officers may validly consider a suspect's "presence in a high-crime area" in forming a reasonable suspicion) (citation omitted). Defendant was wearing a baseball cap, which according to Officer Barrera, was something that persons engaged in mail theft might wear to hide their faces from security cameras. (*See* Barrera Decl. ¶ 4.) Additionally, based on Officer Barrera's training and experience with investigating property crimes, Officer Barrera knew that "it is common for burglaries to take place . . . early in the morning before there are people out on the street[.]" (Barrera Decl. ¶ 4.)

Defendant argues that he was looking for an Uber after remaining in the area for a party the night before. (Dkt. No. 43-1 at 10.) However, the Court does not find this argument credible. It is reasonable to assume that an individual anticipating an Uber will periodically check the GPS system on the Uber mobile application to determine the exact pick up location and the estimated time of the Uber's arrival.

Officer Barrera did not once see Defendant looking at his phone.

According to Supreme Court precedent, law enforcement officers are to "draw[] inferences and make deductions" based on the "modes or patterns of operation" of the suspect in question. *Cortez*, 449 U.S. at 418. Based on the fact that the Officers witnessed Defendant carrying several packages into an alley, in a neighborhood experiencing a high rate of mail theft, while it was still dark, and coupled with the Officers' particularized training and experience as part of a surveillance team specifically assigned to combat property crime, it was reasonable for the Officers to deduce that crime was "afoot" such that the investigatory stop was lawful. (*See* Barrera Decl. ¶ 4); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) ("The reasonable-suspicion standard is not a particularly high threshold to reach.").

### B. Whether Officer Nava's Questioning Constituted Custodial Interrogation for Purposes of *Miranda*

Defendant was not "in custody" for purposes of *Miranda* when Officer Nava stopped and questioned Defendant regarding his suspicious behavior. *See Miranda*, 384 U.S. 436; *see also Berkemer*, 468 U.S. at 440 ("persons temporarily detained pursuant to [investigative] stops are not 'in custody' for the purposes of *Miranda*"). An officer whose observations lead him to reasonably suspect that an individual has committed, is committing, or is about to commit a crime, may briefly detain the individual to "investigate the circumstances that provoke suspicion" and ask "a moderate number of questions to . . . obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439 (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975)); *see also Terry*, 392 U.S. at 29 (Officers conducting investigative stops are not limited to one or two questions as long as the inquiry is "reasonably related in scope to the justification for their initiation."). Additionally, "[a] valid stop does not become an arrest merely because law enforcement agents momentarily restrict a person's freedom of movement." *United*

*States v. Jacobs*, 715 F.2d 1343, 1345 (9th Cir. 1983).

Defendant argues that he was effectively "in custody" and he no longer felt free to leave when Officer Nava's LAPD cruiser approached with lights flashing, and told Defendant to "stop." (*See* Dkt. No. 43-1, Ex. B (Declaration of Sevan Karapetyan) (hereinafter, "Karapetyan Decl.") ¶ 3.) As explained above, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned." *Stansbury*, 511 U.S. at 323. To determine whether a reasonable person in Defendant's situation would have believed himself to be physically deprived of freedom to such a significant extent as to be "in custody," the Court will analyze the factors enumerated in *Beraun-Panez*: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and[,] (5) the degree of pressure applied to detain the individual." *Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (citing *Beraun-Panez*, 812 F.2d at 580).

First, the language used to summon Defendant involved nothing more than Officer Nava telling Defendant to "stop." (Karapetyan Decl. ¶ 3.) Second, Defendant was not confronted with any evidence of guilt. Third, the encounter took place in a two-lane-wide alley, bordered on one side by several residences and numerous windows, in a residential neighborhood on the Westside of Los Angeles. (*See* Opp'n. at 6; Opp'n., Ex. 1 (Dkt. No. 44-2) at 4; Arrest Report at 2, 10.) Due to the fact that several residences' windows lined the alley, and that Officer Nava did not play a part in isolating Defendant "from the outside world[,]" the location of the questioning does not increase the likelihood that Defendant was in custody. *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002); *see also Beraun-Panez*, 830 F.2d at 127 (isolating the suspect from others "contributed to the custodial nature of the interrogation").

Fourth, the duration of Defendant's detention is unclear, though the Supreme Court has not imposed a rigid time limitation on stops of this nature.[2] *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) (concluding that a 20-minute detention of the suspect "clearly [met] the Fourth Amendment's standard of reasonableness"); *see also United States v. Mayo*, 394 F.3d 1271, 1275–76 (9th Cir. 2005) (concluding that a 40-minute detention did not exceed constitutional limits). More relevant to the element of duration is "whether the police diligently pursue[d] their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983); *accord Haynie v. County of Los Angeles*, 339 F.3d 1071, 1076 (9th Cir. 2003) (a *Terry* stop does not have a rigid time constraint as long as the officer conducts the investigation reasonably and diligently). It does not appear that the Officers' actions "involve[d] any delay unnecessary to the[ir] legitimate investigation." *Gallegos v. Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (concluding that the defendant was not in custody where "the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]") (citations and internal quotation marks omitted).

Lastly, the degree of pressure the Officers applied to detain Defendant at the time they stopped to ask him if the packages belonged to him was minimal. *See United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988) (holding that the stop was more than an investigatory *Terry* stop in light of the officer's aggressive and intrusive force and detention techniques). Moreover, there is no evidence that the Officers employed coercive or intimidating means to detain Defendant or to undermine his "will to resist and to compel him to speak[.]" *Miranda*, 384 U.S. at 494. Officer Nava entered the alley in a marked police vehicle with the lights flashing, (*see* Opp'n. at 7), told Defendant to "stop," (Karapetyan Decl. ¶ 3), and

---

[2] There is no evidence on the record that the Officers deliberately delayed making a formal arrest in order to evade compliance with *Miranda*. Therefore, the Court need not address that issue here. *See United States v. Woods*, 720 F.2d 1022 (9th Cir. 1983).

11

asked if the packages belonged to him, (*see* Opp'n. at 9). Defendant said "no," and claims that he "stopped and complied with the officers commands because [he] did not feel free to leave." (Mot. at 3.) Officer Nava drew his gun and pointed it at Defendant at some point after he ordered Defendant to put the packages down. (*See* Karapetyan Decl. ¶ 6.) Defendant again claims that he did not feel free to leave. (*See* Karapetyan Decl. ¶ 6.) At this time, Officer Barrera remained roughly fifty feet away from Officer Nava and Defendant, dispelling the possibility of a heightened degree of pressure due to a high number of officers present on the scene. *See United States v. Wauneka*, 770 F.2d 1434, 1238–39 (9th Cir. 1985) (finding a custodial interrogation where four or five officers were present when the suspect was questioned). Because Officer Nava drew his gun after Defendant stated that the packages were not his, the drawn gun does not impact the analysis as to whether Defendant was in custody at the time of his admission that the packages did not belong to him.³ Officer Nava employed minimal pressure when he stopped and questioned Defendant, and Defendant responded without coercion.

Therefore, the Court finds that Defendant was not "in custody" for purposes of *Miranda* at the time Officer Nava stopped Defendant to ask him if the packages

---

³ Although the gun is inconsequential as to the issue of custody in this case, as Officer Nava asked Defendant if the packages belonged to him before drawing his gun, the Court finds that Defendant was not in custody at the time Officer Nava drew his gun. *See United States v. Brown*, 563 F.3d 410, 413, 415 (9th Cir. 2009) (concluding the suspect was not in custody when five or six officers approached with guns drawn and ordered the suspect to the ground, handcuffed her, and patted her down for weapons). "Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995). Therefore, if Officer Nava drew his gun at the sight of the knife in Defendant's waistband after Defendant turned around with his hands on his head, it was for the purpose of protecting against the possibility of Defendant using the knife, and not for the purpose of detainment. (*See* Opp'n. at 9.) Similarly, if Officer Nava drew his weapon in response to Defendant looking up and down the alley as though he would attempt to flee, the drawn gun was a warranted means of protecting against Defendant's escape. *See United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983) (finding the officers' "initial detention and handcuffing of [the suspect] were justified as a *Terry* stop" where officers approached the suspect with their weapons drawn). Regardless of the moment in which Officer Nava drew his gun, the moment in which Defendant claimed that the packages did not belong to him is uncontroverted.

belonged to him, and was therefore not subject to *custodial* interrogation. *But see Beraun-Panez*, 812 F.2d at 580 (finding that the defendant was in custody where officers employed "good guy/bad guy" tactics, exploited the defendant's alien status, and repeatedly insisted on the "truth" before the suspect gave information). *Miranda* warnings are meant to function as constitutional safeguards that protect against the risk of undue coercion. *See Miranda*, 440 U.S. at 444. No such risk existed here.

## C. At What Point Did the Stop Turn Into an Arrest

Courts determine the point at which a *Terry* stop becomes an arrest by analyzing the "surrounding circumstances[,] including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir. 1980). Defendant admitted that he did not own the packages, to which Officer Nava responded by ordering Defendant to set the packages down. (*See* Dkt. No. 43-1 at 10.) Defendant complied and then looked left to right, which Officer Nava, pursuant to his training and experience, interpreted as a possibility that Defendant may flee. (*See* Opp'n. at 9.) Officer Nava neutralized this possibility by ordering Defendant to turn around and place his hands on his head. (*See* Opp'n. at 9.) Defendant complied, and in so doing, revealed a twelve-inch knife tucked into his waistband. (*See* Opp'n. at 9.) At some point between Officer Nava's demand to place the packages on the ground and his discovery of the knife, Officer Nava drew his gun. Officer Barrera approached Defendant, recovered the knife, handcuffed Defendant, and conducted a pat-down search for weapons based on the reasonable suspicion that Defendant might have had other weapons on his person. *See United States v. I.E.V.*, 705 F.3d 430, 432–33 (9th Cir. 2012) ("Where an officer reasonably believes that the persons with whom he is dealing may be armed . . . , the officer may conduct a frisk or pat-down search of that person.") (citations and internal quotation marks omitted); *see also Terry*, 392 U.S. 1, 32 ("a limited frisk incident to a lawful stop must often be rapid and routine"); *accord Sibron v. New York*, 392 U.S. 40, 67 (1968) (affirming a

conviction where officers patted down the defendant's outer clothing and discovered an object in his pocket which might have been used as a weapon[, and] discovered it to be a potential instrument of the crime [charged]").

Contrary to Defendant's claim, pointing a weapon at a suspect, and handcuffing a suspect "does not automatically convert an investigatory detention into an arrest[.]" *Allen*, 66 F.3d at 1056 ("Pointing a weapon at a suspect, ordering him to lie on the ground, handcuffing him, and placing him for a brief period in a police vehicle for questioning—whether *singly* or in combination—does not automatically convert an investigatory detention into an arrest requiring probable cause." (emphasis added)); *see Unites v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (the suspect was not under arrest when officers ordered him out of a car at gunpoint). Officers conducting investigatory stops are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see also Terry*, 392 U.S. at 23 ("it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties"). Officer Nava approached Defendant without his gun drawn, but later drew it to neutralize Defendant's potential use of the knife or other weapon. *But see United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (finding an arrest where officers "had completely surrounded [the] appellee's trailer with their weapons drawn and ordered him . . . to leave the trailer and drop to his knees"). Though the gun is not dispositive in determining whether Defendant was under arrest, the Court finds that the use of the gun did not escalate the Officer's degree of force enough to convert the stop into an arrest.

The Government cites *United States v. Taylor* to contend that despite Officer Barrera's use of handcuffs on Defendant, the stop remained a *Terry* stop. (Opp'n. at 13); *See Taylor*, 716 F.2d 701. The Court agrees. Officer Nava's demand that Defendant place his hands on his head was meant to protect against the possibility of

14

Defendant's escape. Similarly, Officer Barrera's decision to handcuff Defendant, after he removed the twelve-inch knife from Defendant's waistband, was intended to neutralize the possibility of Defendant's use of any other weapons that he might have had on his person. "[T]he use of handcuffs, if reasonably necessary, . . . do not necessarily convert a Terry stop into an arrest necessitating probable cause." *Taylor*, 716 F.2d at 709; *United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir. 1982) (handcuffing suspect did not convert valid *Terry* stop into an arrest). Thus, Defendant was not placed under an arrest at the time that Officer Barrera handcuffed Defendant and conducted the pat-down search. *See Taylor*, 716 F.2d 701 (no arrest when suspect stopped at gunpoint, ordered to lie face down in ditch, handcuffed, and frisked).

### D. Whether There Was Probable Cause to Arrest Defendant

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.3d at 1072 (citing *Beck*, 379 U.S. at 91). The Ninth Circuit has held that reasonable suspicion to stop "may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop." *United States v. Medina-Gasca,* 739 F.2d 1451, 1453 (9th Cir. 1984). In determining whether probable cause exists, courts evaluate the totality of the circumstances. *Scott*, 705 F.3d at 417. Similarly, under the collective knowledge doctrine, courts will consider "the collective knowledge of all the officers involved in the criminal investigation[.]" *Ramirez*, 473 F.3d at 1032 (internal quotation marks omitted); *Rosenbaum*, 663 F.3d at 1076.

Here, the Officers had probable cause to arrest Defendant because: (1) the incident occurred at an hour in which property crime is likely to occur; (2) the neighborhood was experiencing an increased frequency in mail theft; (3) Defendant admitted that he did not own the packages that he was holding; (4) one of the packages was taped with Amazon Prime Echo tape (a brand unavailable to the

general public as it is only used to tape packages purchased on Amazon.com); and, (5) the Officers recovered from Defendant a broken metal file matching two pieces found near the entrance to the apartment building, along with damage to the door. (*See* Dkt. No. 43-1; Barrera Decl.) Consequently, Defendant's request to quash his arrest is unsubstantiated.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion is **DENIED**.

IT IS SO ORDERED.

Dated: August 11, 2017

_____
Beverly Reid O'Connell
Judge, United States District Court